## Cincinnati, New Orleans & Texas Pacific Railway Company v. Ed. Murphy, Jr.

### (Decided October 5, 1915.)

### Appeal from Lincoln Circuit Court.

1. Trial—Evidence.—Admission of secondary evidence as to customs and rules in force with reference to care and use of

switches and sidings, was not prejudicial to appellant when it appears that appellant began the introduction of this character of evidence and subsequently put in evidence certain written rules with reference to the subject, and the rules were not copied into the record, making it impossible for the court to tell whether the witnesses gave fair and accurate descriptions of the contents of the written rules.

2. Trial—Instructions.—Where the court instructed the jury to find for plaintiff such sum as will reasonably compensate him for any "impairment or destruction" of his power to earn money, although there is no allegation in the petition that plaintiff's power to earn money was "destroyed," held, the use of the word "destruction" was surplusage. The words were used synonymously and, with the context, could have but one and the same meaning.

3. Trial—Verdict.—Verdict for $3,000 for broken leg and permanent injury and resulting pain and suffering from the accident, held not excessive.

K. S. ALCORN and JOHN GALVIN for appellant.

EMMET V. PURYEAR, ROBT. HARDING and P. M. McROBERTS for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

A railroad motor car was derailed, and appellee, who was riding on this car in performance of his duties as an employe of appellant, had his leg broken. He sued and recovered $3,000 as damages. It appears that he was employed as a telephone lineman, and that the crew with which he was working was furnished a motor car by the company for transport along the road. A foreman was in charge of the crew, and a conductor was in charge of the car. It was the conductor's duty to keep a lookout for the safety of the men while the car was being used on the tracks of the company. The crew boarded in camp cars which, at the time, were situated on a siding near the south end of the Danville yards, and the injury occurred near the boarding cars.

The crew stopped work at about 5:30 p. m., at a point nearly a half mile north of the place where the injury occurred. The car, by direction of the conductor, was placed upon the south bound main track so that the crew might be carried to the boarding cars. This took them through a part of the Danville yards and over a straight

track, and down a grade. Including conductor and foreman, 10 men were aboard the car. No witness gives the dimensions of the car, but, as we understand the evidence, if it was not crowded, there was little, if any, room for others. The foreman, W. D. Murphy, a brother of the appellee, sat near the middle of the car and operated a gasoline engine which afforded the motive power. He also was in position to use the brake lever. The conductor sat in front in order to keep a lookout. The car ran toward the boarding camp at the rate of 12 or 15 miles per hour, and, as the conductor says, when they got to within 6 or 8 rail lengths of the switch he raised up to see how the switch was set and his hat blew off. He turned around to catch the hat. When he recovered himself they were within four rail lengths of the switch, and, looking again, he saw the switch was open, and, as he says, "I hollored 'Open switch, Murphy.'"

Appellant's witness testifies that the conductor could have seen the switch target a quarter of a mile. The conductor says he could not see it quicker, because the sun was shining in his eyes. The foreman and other witnesses say that when the conductor called that the switch was open they were then within three or four rail lengths of it. The foreman, after raising up for a look ahead, applied the brake. Seeing that the brake would not stop the car, he shouted, "She is going through, boys, you had better jump off." All jumped but the conductor, the appellee, and another man. The conductor then caught the brake handle in an effort to stop the car, but it ran on over the switch and was derailed.

It should be explained that this switch or siding was parallel to the main track and led into it at the point in question. How it happened to be open at this time is in dispute. The appellant proves by one witness that an engine had gone onto the siding and the switch was not closed because those in charge of the engine expected to come out with it in a short time. This telephone crew traveled alongside of this siding for a quarter of a mile and none of them saw or heard the engine, although they remained there at the switch for at least one-half hour after the accident. No member of an engine crew was introduced to prove any such use of the siding.

Appellant seeks a reversal on three grounds: (1) The court erred in admitting secondary evidence as to the contents of a bulletin; the bulletin was printed and no

reason given as to why it was not introduced; (2) errors in instructions; and (3) excessive damages.

As to the admission of secondary evidence, we may say that, appellant first introduced evidence of this kind. Appellee then attempted to controvert the facts proven by appellant, and introduced evidence of the same character. Later on both parties introduced certain written rules of the company, but they are not copied into the transcript. We understand, however, from the comment of the witnesses that they related to the duties of employes with reference to using and locking switches. Since these rules were, in fact, read to the jury, the fact that they were not copied into the record makes it impossible for us to determine whether the version thereof objected to, as given by some witnesses, was inaccurate. Certainly we cannot say, under the circumstances, that the introduction of secondary evidence was prejudicial to appellant's substantial rights.

Appellant complains that the court erred in refusing to submit to the jury its theory of the case as embodied in instruction "A," which it offered. The appellant, in effect, desired the court to instruct the jury that if at the time of the accident the switch was being used by an engine for the purpose of bringing cars therefrom, and, under the regulations in force in the yards, it was the custom to leave the switch open, under such circumstances, then they would find for the company. Appellant cannot complain of error in this, for the court substantially submitted that theory of the case by giving to the jury instruction No. 1, which directed them to find for the company, if they believed the switch was being used at the time, and it was the custom to leave the switch open under such circumstances without having a brakeman at the switch.

Instruction No. 2 submitted the question of negligence of the conductor in failing to keep a lookout ahead, and predicated a recovery by plaintiff on condition that the conductor could, by the use of ordinary care, have discovered that the switch was open in time to stop the car and avoid running into the switch. We have already related in substance the facts on this point, and they abundantly justify the submission of the question to the jury.

Appellant says the instruction as to measure of damage was erroneous. This instruction directed a finding

for appellee in such a sum as will "fairly and reasonably compensate the plaintiff for any mental or physical pain and suffering caused him from said injuries mentioned in evidence, and also for any temporary or permanent impairment or *destruction* of his power to earn money, if any." Appellant criticizes the use of the word "destruction," and says there is nothing in the pleadings or in the testimony going to show that plaintiff's power to earn money was destroyed. The petition charges that his power to earn money "has been materially and greatly and permanently impaired," and appellee introduced proof to show that there has been permanent impairment. The words "impairment or destruction" were used synonymously and, with the context, cannot be understood to have any other than one and the same meaning. If his power to earn money was permanently impaired it was to that extent destroyed. While the word "destruction" was surplusage and, for that reason, had no proper place in the instruction, we cannot see how its use confused or misled the jury.

To the complaint that the damages assessed are excessive, the proof shows that Murphy was in the hospital 22 days; his leg was kept in a plaster cast for nearly 10 weeks. An X-Ray photograph of the bone union shows malformation. The evidence is conflicting as to whether this condition was different from that ordinarily found in healed fractures. It is shown that Murphy suffered great pain and still suffers on account of the fracture. His leg is weak, and he can do little work, where the use of the broken leg is required, without suffering pain and inconvenience; that there is a constant numbness in his leg, and, when walking on uneven ground, he staggers and his steps are not sure. The broken leg is from one-third to one-half inch shorter than the other. There is a conflict in the medical testimony as to the probable duration of this numbness and weakness. Some of the doctors testify (nearly a year after the accident) that the injuries are no more than temporary, if, indeed, Murphy was not then fully restored. Other doctors testify that "it is a permanent injury, it is impossible for it to be a temporary injury; he can never use it the same."

Under these circumstances we cannot say that the amount allowed is so flagrantly or palpably against the

weight of the evidence as to indicate that the jury was under the influence of passion or prejudice. Judgment for damages in larger amounts for similar injuries have heretofore been sustained.

The judgment is, therefore, affirmed.